**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

EDWARD JONES,

        *Plaintiff,*

   v.

FALCONWOOD, INC.,

        *Defendant.*

Civil Action No. 23 - 2490 (LLA)

## MEMORANDUM OPINION

Plaintiff Edward Jones brings this action against Defendant Falconwood, Inc., alleging retaliation in violation of the National Defense Authorization Act ("NDAA"), 41 U.S.C. § 4712; the False Claims Act ("FCA"), 31 U.S.C. § 3730(h); and 42 U.S.C. § 1981.  ECF No. 1. Falconwood has filed a motion for summary judgment on all three counts.  ECF No. 20.  Mr. Jones has moved for leave to file a surreply, ECF No. 27, which Falconwood opposes, ECF No. 28.  For the following reasons, the court will grant Mr. Jones's motion for leave to file a surreply and grant Falconwood's motion for summary judgment.

### I.     FACTUAL BACKGROUND

#### A.    Mr. Jones Joins Falconwood on the PMW 220 Project

Falconwood provides system engineering and IT services to the federal government.  ECF No. 20, at 44 ¶ 2; ECF No. 22-24 ¶ 2.[1]  It has a contract with the U.S. Navy to provide program

---

[1] When citing ECF Nos. 20, 20-3, 20-8, 20-10 to 20-16, 20-20, 22-11, 22-24, and 25-2, the court uses the CM/ECF-generated numbers at the top of each page rather than any internal pagination. Because ECF No. 20-4 lacks internal pagination, the court uses the PDF page number.

management and logistics services for the PMW 220 Project (the "Project"), which involves a major Navy procurement system.   ECF No. 20, at 44-45 ¶¶ 3, 5; ECF No. 22-24 ¶¶ 3, 5. Falconwood is just "one of many contractors" on the Project.   ECF No. 20, at 44 ¶ 4; ECF No. 22-24, at 1-2 ¶ 4.  One aspect of the project involves the migration of several Navy business and logistics systems into a single procurement system.  ECF No. 20, at 45 ¶ 6; ECF No. 22-24 ¶ 6.

Mr. Jones began working for Falconwood as a Senior Program Manager on the Project on August 17, 2020.  ECF No. 20, at 46 ¶ 11; ECF No. 22-24 ¶ 11.  He was hired to "support[]" the Project's "large-scale migrations and implementations."  ECF No. 20, at 46 ¶ 12; ECF No. 22-24 ¶ 12.  Senior Consultant Robert Bean was Mr. Jones's team lead and immediate supervisor, and both men reported to Program Manager Sue Licatovich.  ECF No. 20, at 46 ¶ 15; ECF No. 22-24 ¶ 15.  Adrienne Williams was the Navy employee in charge of migration efforts for the Project. ECF No. 20, at 45 ¶ 7; ECF No. 22-24 ¶ 7.

Falconwood routinely assigned new members of the migration team to attend meetings and take minutes as they learned about the Project and their role, but senior members like Ms. Licatovich would also take meeting minutes when needed.  ECF No. 20, at 46 ¶ 16; ECF No. 22-24 ¶ 16; *see* ECF No. 20-3, at 10 (Ms. Licatovich testifying that "we have various team members" take minutes, which are typically no more than a "page-and-a-half" of status updates). Accordingly, on several occasions, Mr. Jones was "assigned to take meeting minutes."   ECF No. 20, at 46 ¶ 16; ECF No. 22-24 ¶ 16.

On September 22, 2020, Mr. Jones sent an email to "his colleagues" stating that "there was no need for him 'to continue performing as an Administrative Assistant' by taking meeting minutes." ECF No. 1 ¶ 27; ECF No. 22-6 ¶ 29.  On his telling, because the type of employees who

2

perform administrative work "should [make] $20-35 per hour," and he believed that Falconwood was charging the Navy $200 per hour for his services, Falconwood was thus overbilling the Navy by requiring Mr. Jones to conduct administrative tasks. ECF No. 22-6 ¶ 27. Mr. Jones also believed that another employee was taking and sending minutes for the same meetings, resulting in Falconwood "double billing" the Navy. *Id.* ¶¶ 29-30. The record does not indicate whether Mr. Jones told any of his supervisors that, by requiring him to take meeting minutes, Falconwood was defrauding the Navy. *See generally* ECF Nos. 20-4, 22-6. It is undisputed that Mr. Jones would have attended these meetings whether he had to take minutes or not. ECF No. 20, at 46 ¶ 16; ECF No. 22-24 ¶ 16.

Given the scale of the Project, Falconwood routinely sent out status reports to a "large distribution list" that "noted whether specific tasks were 'on-track,' 'at-risk,' 'off-track[,]' or 'complete.'" ECF No. 20, at 45 ¶ 8; ECF No. 22-24, at 2 ¶ 8. Falconwood began using these labels to indicate a task's status before Mr. Jones was hired. ECF No. 20, at 45 ¶ 8; ECF No. 22-24 ¶ 8; *see* ECF No 20-5 (tagging several tasks as "at risk" or "off track" in an August 5, 2020 status report sent to dozens of official Navy employee email addresses). And at the time of Mr. Jones's hiring, the Navy was already aware that several tasks related to the migration effort were behind schedule. ECF No. 20-4, at 7, 15; *see* ECF No. 20, at 47 ¶ 18, ECF No. 22-24 ¶ 18. Falconwood states that one of its other employees was generally responsible for collecting and presenting the status reports, also known as "quads." ECF No. 20, at 45 ¶ 9; ECF No. 22-4 ¶ 9; *see* ECF No. 20-3, at 12. Mr. Jones alleges that he "too prepared the quad reports." ECF No. 22-24 ¶ 10. In particular, from October 6, 2020 through November 17, 2020, Mr. Jones sent weekly status reports indicating that several tasks were "at risk" of falling behind schedule and that one task was fully "off track" and thus would require additional time to be completed. ECF No. 1 ¶ 37 & n.3.

3

Ms. Licatovich testified in her deposition that "someone in [Mr. Jones's] role would have . . . been requested to track down input for the quad report" but that the report would "speak for itself with regards to" designating a task's risk level.  ECF No. 20-3, at 12-13.

Mr. Jones alleges that on November 21, 2020, he called Falconwood Chief Operating Officer Travis Jones ("COO Jones") to complain about two instances of racial harassment.  ECF No. 1 ¶¶ 39-41.  First, Mr. Jones reported that Mr. Bean had told him that he was "a member of the A-Team"—also the name of a television series featuring a Black character named Mr. T—and then said "just don't come wearing gold chains like Mr. T!"  *Id.* ¶ 39; *see* ECF No. 20-4, at 17.  Second, Mr. Jones reported that Mr. Bean would "hum and sing the song from the 1970s sitcom *The Jeffersons* around" him, which Mr. Jones took as a comparison between himself and "another African American male, George Jefferson, the actor in the sitcom."  ECF No. 1 ¶ 40; *see* ECF No. 20, at 116.

Falconwood provides evidence from multiple employees denying that either incident occurred or was reported.  COO Jones stated in his declaration that "Mr. Jones did not report or complain about Robert Bean's conduct" or disclose "that Mr. Bean had called him 'Mr. T' or sang the theme song from the Jefferson's [sic] to him," ECF No. 20-33 ¶ 5; Mr. Bean testified that he did "not recall" making any comment about Mr. T or wearing gold chains, ECF No. 20-8, at 10; Falconwood's Human Resources Director, Vonda Fields, testified at her deposition that she was not aware of any conversations about the alleged incidents, ECF No. 20-20, at 4; and Ms. Licatovich filed a declaration stating that Mr. Jones "never complained to [her] about racial discrimination [or] harassment" and that she was "unaware of any such complaints or claims raised by Mr. Jones before his termination to anyone else," ECF No. 20-22 ¶ 3.

### B.    Falconwood Removes Mr. Jones from the Project at the Navy's Direction

On November 23, 2020, Ms. Williams—the Navy employee in charge of the Project's migration efforts—sent Ms. Licatovich and Mr. Bean an email requesting that Mr. Jones be removed from the migration team. ECF No. 20-9. She explained that although "[w]e have given him a number of assignments, most of [the] results have not come to fruition or [realized] value." *Id.* Ms. Williams provided two examples. First, she explained that she had asked Mr. Jones to monitor and report an activity referred to as "BODS" with the "intent" that he would be "the integration point across the various migrations and the centralized BODS updates occurring." *Id.* During their weekly internal meeting, Mr. Jones did "not have the updates/details for BODS" and the supervisory project manager reported that "there ha[d] been little interaction with [him]." *Id.* Ms. Williams also explained that while the Navy "gets the weekly BODS quad," or status report on BODS updates, "directly from" another employee, Mr. Jones would routinely send a "quad on conversion status labelled [sic] as BODS" that was "not the actual BODS enhancement project." *Id.* Ms. Williams wrote in her email that she "discontinue[d]" Mr. Jones's BODS chart assignment "as the info he supplies is already covered" in the existing status reports. *Id.* Second, Ms. Wiliams explained that she had assigned Mr. Jones to create a process to reconcile "schedule data coming from multiple areas," but because "a process ha[d] not yet been established" after several follow-up meetings, she was "just reconciling on [her] own." *Id.* In closing, Ms. Williams asked Ms. Licatovich and Mr. Bean to "let [her] know what need[ed] to happen to bring a replacement for [Mr. Jones] onboard." *Id.*

On December 2, Ms. Licatovich and Mr. Bean provided a ninety-day performance review to Mr. Jones, which stated:

> Edward is smart and hard working but fails to consider what is being
> asked by [the] client. Edward is well versed in project management

> best practices but is unable to adapt to a project that is not working under those processes. The client has expressed dissatisfaction with his lack of productivity[,] expressing that a task that was to be delivered weekly had never once been delivered and on BODS he was only forwarding what [another employee] had delivered, and his meeting minutes had errors and were lacking detail. We understand that this is a complex project, but for someone at Edward's level this lack of performance is unacceptable.

ECF No. 20-10. In the performance review, Falconwood explained that it would be implementing a thirty-day improvement plan ("PIP"). *Id.* As grounds for the PIP, Falconwood explained that the "level of review/audit does not provide what was requested for the client's immediate need" and provided a section with specific instructions as to "what is needed/requested." *Id.* The PIP required Mr. Jones to identify and compile date discrepancies across systems and to send the results to Ms. Williams, Navy contractor Vanessa Marfo, Mr. Bean, and Ms. Licatovich by close of business the next day, December 3, 2020. *Id.*; ECF No. 22-24, at 5-6 ¶¶ 26-27.

On December 4, Mr. Jones emailed the results of the assignment to the requested recipients. ECF No. 20-11, at 3-5. Mr. Bean responded to the other recipients—excluding Mr. Jones—with his high-level assessment of Mr. Jones's performance on the assignment. He noted some "Good" things: that "all four commands were reconciled," that it was "completed within a single day," which "[i]ndicates that" it could routinely be completed between Wednesday and Friday, and that Mr. Jones had successfully raised some discrepancies. *Id.* at 2-3. Mr. Bean also noted some "Bad" and "Okay" things: confusing presentation aspects such as random colors, highlights, and blank rows; inclusion of items that did not in fact contain any discrepancy; and, based on a spot-check, "a small number of instances" where Mr. Jones had failed to catch discrepancies. *Id.* at 3. Mr. Bean asked Ms. Marfo to provide her own assessment, since she was likely closer to the work. *Id.* at 2. Ms. Marfo replied, agreeing that "for the most part," Mr. Jones had met "the deliverable request." *Id.* Ms. Williams concurred, noting that "[t]he ask was

ultimately met but not in fast enough turn[-]around time nor presented in a fashion that we could quickly come to ground truth on any of these items before our weekly cycle is complete." *Id.* Ms. Williams recommended that "this effort stand down" because she did not believe that Mr. Jones's repeating this weekly deliverable would "significantly improve our reporting," and "in fact, may cause more confusion." *Id.*

On December 10, Mr. Jones provided a rebuttal to what he described as "a horrible and extremely untruthful" performance review. ECF No. 22-11, at 1-2. He attached several exhibits to support his statement that his work was "remarkable." ECF No. 20-12, at 3. Mr. Jones explained that "although [he] was hired as a Senior Program Manager," he had "stood up to the occasion" and completed "even those tasks of being a 'Secretary'" because he was "a Team Member." ECF No. 22-11, at 3; *see id.* at 4-5 (complaining in response to the PIP that he "spent the first five weeks performing as a Secretary, and writing, editing[,] and distributing meeting minute notes"); *id.* at 6 (explaining that he had spent twenty-five hours per week attending meetings, and eight hours per week "creating, editing[,] and distributing meeting minute notes"). Mr. Jones also claimed that, although he lacked knowledge that the reconciliation project for "auditing data" was supposed to be a weekly project, he "st[ood] ready to listen and accommodate the Navy Client" and thus was "prepared and willing to provide a weekly 'Reconciliation' report." *Id.* at 3.

The next morning, COO Jones emailed Ms. Fields and Ms. Licatovich asking them to discuss Mr. Jones's response to his PIP and address the "immense disconnect." ECF No. 20-13, at 3. Ms. Licatovich explained that she was out "on medical [leave]" and "could counter every exhibit" of Mr. Jones's response, "but why?" *Id.* She later explained that "[t]he problem is now that the client doesn't want to give him anything to do" because he would not use the government's

project management system, so the team "struggle[d] to give him something useful to do that [could] be evaluated." *Id.* at 2.

On December 14, Ms. Licatovich sent Ms. Fields and COO Jones a comprehensive rebuttal to each point in Mr. Jones's response. ECF No. 20-14. She also attached emails from the Navy and included quotes from messages the Navy had sent her about Mr. Jones, such as:

- "He has not acclimated to the team and is disrupting calls with irrelevant questions, not making pmw220 look good,"

- "I am also hearing that he has call[e]d [senior Navy executives] directly . . . if I hear he goes [over] my chain of command again I will formally request he be removed,"

- "He has no authority and is representing PMW220 in a poor light."

*Id.* Ms. Licatovich expressed her concern that Mr. Jones was "not able to adapt to the way our team works with all of the vendors, Commands, and other stakeholders," and she asked Ms. Fields for advice on how to proceed. *Id.*

After the Navy had requested Mr. Jones's removal from the Project in late November, Ms. Licatovich had begun "trying to find him a home." ECF No. 20-3, at 15-16. On December 22, Mr. Jones emailed several Navy and Falconwood employees stating that he was "pleased to announce that [he] ha[d] plenty of bandwidth and available time and skillsets, to assist and to take on additional work assignments," and asking the recipients to "consider delegating tasks to [him]." ECF No. 20-16, at 3-4. Ms. Licatovich responded, asking him to prepare "a white paper on how to start up a project" by noon on December 29. *Id.* at 2. She believed that the white paper "could be helpful for the team" as a "guide on starting up these migrations or projects" given Mr. Jones's "good program management knowledge." ECF No. 20-3, at 14. Mr. Jones sent a draft on December 29, and Ms. Licatovich provided a response with "considerable comments" on

8

December 30 and asked for a revised version by close of business on December 31. *See* ECF No. 20-16, at 2-3. On January 4, 2021, having received no response, Ms. Licatovich sent a follow-up email. *Id.* at 2. Mr. Jones responded that Ms. Licatovich's feedback was "excellent" and that he would "provide an updated document ASAP." *Id.* Ms. Licatovich replied, noting that Mr. Jones had missed the December 31 deadline and asking whether he had taken leave on that day. *Id.*

On January 6, Mr. Jones sent an email titled "Harassment and Hostile Work Environment," in which he raised several complaints about feedback from his supervisors—none of which he connected to his race. *See* ECF No. 20-19. In the email, Mr. Jones disputed Falconwood's statement in the PIP that he had failed to complete certain projects on time, *id.* at 1, took issue with Ms. Licatovich's "look[ing] upon" him "as being an employee that inconsiderately ups and takes PTO without informing his supervisor," *id.* at 3, and argued that his supervisors had wrongly concluded in his PIP that his meeting minutes were "full of errors" and that the Navy client was frustrated with his "lack of productivity," *id.* at 5. Mr. Jones then stated that "[d]ue to these constantly harassing tactics by Falconwood, [he was] now part of a hostile work environment" and "[was] constantly being harassed." *Id*. at 5. He expressed his "hope that . . . providing notification of this hostile work environment" would "result in Falconwood offering classes in 'Harassments', 'Race Relations', 'Bullying', etc." *Id.* Mr. Jones closed by stating that he "hope[d] that" he would not be "retaliated against" by raising these "concerns about 'Harassments', 'Race Relations', 'Bullying', etc." *Id.*

### C.    Falconwood Reassigns Mr. Jones, Then Terminates Him

Around January 14, Ms. Licatovich reassigned Mr. Jones to work with Reggie Scott in Falconwood's Risk Management Department because she "thought maybe [Mr. Jones] could work

well at risk because it's very formulaic in nature" and because Mr. Scott was "swamped and he needed a lot of help." ECF No. 20, at 54 ¶ 49; ECF No. 22-24 ¶ 49; *see* ECF No. 20-23. Mr. Bean monitored Mr. Jones's performance on the new assignment, and he responded to one of Mr. Jones's emails containing a draft status report, asking Mr. Jones to "[r]eview for redundant status item[s]" and "for items that have been completed," noting that "[t]here were quite a few tasks that became completed this month" but were "not marked as complete," reminding him to remove items "marked as 100% from a previous" status update, and instructing him to be "mindful of spelling and punctuality." ECF No. 20-24, at 2-3. Mr. Bean forwarded this feedback to Ms. Licatovich "for [her] awareness and to also continue to document [Mr. Jones's] performance." *Id.* at 2.

One part of Mr. Jones's responsibilities under Mr. Scott was updating a "[r]isk [r]egist[er]" and related slide deck in advance of periodic status meetings that happened at noon. ECF No. 20-23; *see* ECF No. 20-25, at 4. At 8:40 a.m. on the morning of one of those meetings in March 2021, Mr. Scott sent Mr. Jones the updated "[r]isk [r]egister" report to use "going forward." ECF No. 20-25, at 5. At 11:10 a.m., Mr. Jones responded to ask for a copy of the report that the team had been discussing during their morning meeting, which had run from 9:00 a.m. to 11:07 a.m., and he promised to update his weekly slide deck and "send it back to [Mr. Scott] and the team between 11:30 and 11:45 a.m." *Id.* at 4-5; *see* ECF No. 22-17, at 2 (Mr. Jones forwarding his email chain with Mr. Scott to Ms. Licatovich and others). Mr. Scott responded with the relevant information two minutes later, at 11:12 a.m. ECF No. 20-25, at 4. Mr. Jones then sent a response, carbon-copying another employee, which stated: "Received document 11:12 a.m., 5 minutes after asking for it. May or may not be finished by 12:00 noon." *Id.* Mr. Scott sent Mr. Jones a follow-up email at 11:53 a.m., telling him that the "stakeholder [was] waiting" and

asking whether the slide deck was ready. *Id.* at 3. Mr. Jones replied to the full team at 11:58 a.m.—stakeholders included—stating that he "d[id] not have the deck ready," ECF No. 22-24 ¶ 55, because of "[Mr. Scott's] delayed delivery, and [because Mr. Scott's] emails were not helpful," ECF No. 22-17, at 2. Mr. Jones stated that "Reggie has hindered my process in delivering the Deck" and appears to have attached his entire chain of emails from the morning to excuse the fact that he did not have the slide deck ready. ECF No. 22-17, at 2; *see* ECF No. 22-24 ¶ 55. Mr. Jones replied all again at 12:05 p.m., saying "nd." ECF No. 22-16, at 2; *see* ECF No. 20-3, at 17-18; ECF No. 20-25, at 3. Another employee responded to the email, saying that "[n]o attachments came through on this." ECF No. 20-25, at 2; ECF No. 22-16, at 1. Mr. Scott then updated the report himself and sent it at 12:22 p.m. with an apology that "our team could not have these risks available for the meeting." ECF No. 20-26. At 12:32 p.m., Mr. Jones again sent an email to all of the stakeholders at the meeting, stating "Here we go" and apparently attaching his draft. ECF No. 20-25, at 2; *see* ECF No. 22-4, at 18. Mr. Scott forwarded that email to Ms. Licatovich and Mr. Bean, with the caption "Edward's submission to stakeholders." ECF No. 20-25, at 2.

At 12:33 p.m., Ms. Licatovich sent an email to Mr. Jones requesting that he "not call out team members in a blast email" and calling his earlier email "inappropriate." ECF No. 20, at 55 ¶ 56; ECF No. 22-24 ¶ 56; *see* ECF No. 22-17. Mr. Jones responded by calling Mr. Scott "a bully" because he did "not listen to [Mr. Jones's] input at times," and he went on to explain that his "point to Reggie" was that he had delayed delivery of the slide deck by holding onto it. ECF No. 22-17, at 1.

That afternoon, Ms. Licatovich emailed Ms. Fields and carbon-copied COO Jones, explaining that "[i]t has become increasingly difficult for us to work with [Mr. Jones] because he

"is not able to communicate with clients or other demands," "requires inordinate amounts of coaching for the simplest of tasks," "is unable to perform quick turn actions" as shown by his failure to deliver the slide deck that morning, and "[w]hat he did deliver was full of errors and not usable." ECF No. 20, at 55-56 ¶ 58; ECF No. 22-24 ¶ 58; *see* ECF No. 22-18. Ms. Licatovich informed Ms. Fields and COO Jones that Mr. Scott "had to do the slides himself and send them late" and that Mr. Jones had called Mr. Scott a "bully." ECF No. 20, at 55-56 ¶ 58; ECF No. 22-24 ¶ 58; *see* ECF No. 22-18. She concluded that "Edward is reflecting poorly on Falconwood," that there was "no requirement for his position," and that "[h]e needs to go." *Id.* Ms. Licatovich stated that COO Jones and Ms. Fields should already have Ms. Williams's previous email asking that Mr. Jones be removed from the Project. ECF No. 20, at 55-56 ¶ 58; ECF No. 22-24, at 12 ¶ 58; *see* ECF No. 22-18.

The next day, March 11, Ms. Licatovich provided additional documentation of Mr. Jones's performance issues, "describ[ed] their efforts to find [Mr. Jones] a suitable position after Ms. Williams requested his removal from the Navy migrations team," and noted that Mr. Scott and Mr. Bean had "both really tried to help him." ECF No. 20, at 56 ¶ 59; ECF No. 22-24 ¶ 59. COO Jones approved Mr. Jones's termination later that day, ECF No. 20 ¶ 60; ECF No. 20-30; ECF No. 22-24 ¶ 60, and Falconwood formally terminated Mr. Jones on March 15, ECF No. 22-19; ECF No. 22-24 ¶ 61. Falconwood did not replace Mr. Jones after his termination. ECF No. 20, at 56 ¶ 62; ECF No. 22-24 ¶ 62.

## II.   PROCEDURAL HISTORY

Mr. Jones filed a complaint with the Office of the Naval Inspector General ("OIG") on July 18, 2023. ECF No. 20, at 56 ¶ 63; ECF No. 22-24 ¶ 63; *see* ECF No. 22-20 (email dated July 18, 2023 "filing a complaint with" OIG on behalf of Mr. Jones). In his complaint, Mr. Jones

argued that Falconwood terminated him for reporting that "Falconwood's various projects were 'at risk' and 'off track' and therefore grossly mismanaged," and for "rais[ing] concerns" about Falconwood overbilling the Navy for his services.  ECF No. 22-20, at 8.

On August 23, 2025, Mr. Jones filed suit alleging retaliation in violation of the NDAA (Count I), retaliation under the FCA (Count II), and retaliation for complaining about race discrimination (Count III).  ECF No. 1.  Following discovery, Falconwood filed a motion for summary judgment on all claims, ECF No. 20, which is fully briefed, *see* ECF Nos. 20, 22, 25.  Mr. Jones has also moved for leave to file a surreply, ECF No. 27, which Falconwood opposes, ECF No. 28.

### III.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[a] party is entitled to summary judgment only if there is no genuine issue of material fact and judgment in the movant's favor is proper as a matter of law."  *Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 805 (D.C. Cir. 2006)); *see* Fed. R. Civ. P. 56(a).  A material fact is one which "might affect the outcome of the suit under the governing law," and a "dispute about a material fact is 'genuine'" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  At summary judgment, the moving party bears the burden of demonstrating "the absence of a genuine issue of material fact" in dispute, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), while the nonmoving party must present specific facts supported by materials in the record that would be admissible at trial and that could enable a reasonable jury to find in its favor, *see Liberty Lobby*, 477 U.S. at 248; *Allen v. Johnson*, 795 F.3d 34, 38-39 (D.C. Cir. 2015).

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000) (quoting *Liberty Lobby*, 477 U.S. at 255); *see Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 295-96 (D.C. Cir. 2015).  Accordingly, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam) (alteration in original) (quoting *Liberty Lobby*, 477 U.S. at 255).  However, the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [his] position," *Liberty Lobby*, 477 U.S. at 252, and he may not rely on "mere allegations" or conclusory statements, *Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011) (quoting *Sierra Club v. Env't Prot. Agency*, 292 F.3d 895, 8999 (D.C. Cir. 2002)).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (citations omitted).

## IV.    DISCUSSION

Mr. Jones raises overlapping retaliation claims under the NDAA, FCA, and Section 1981, arguing that Falconwood removed him from the Project in November 2020 and terminated his employment in March 2021 because he engaged in protected activities.  ECF No. 1 ¶¶ 62-82.  Falconwood raises one defense specific to the NDAA, argues that none of Mr. Jones's myriad complaints about his time at the company are protected under any of the three statutes, and contends that even if Mr. Jones could establish a prima facie case of retaliation, the company removed him and terminated him for legitimate, non-retaliatory reasons.  *See generally* ECF No. 20.  The court begins by addressing two threshold issues—Mr. Jones's request for leave to file a surreply, ECF No. 27, and Falconwood's argument that the court should set aside Mr. Jones's

14

affidavit, ECF No. 22-6, under the sham affidavit doctrine, ECF No. 25, at 2-4.  The court then addresses Falconwood's arguments for summary judgment.

### A.      Threshold Issues

### 1.      Mr. Jones's proposed surreply

While surreplies are "generally disfavored," *Kifafi v. Hilton Hotels Ret. Plan*, 736 F. Supp. 2d 64, 69 (D.D.C. 2010), *aff'd*, 701 F.3d 718 (D.C. Cir. 2012), "[i]t is within the court's authority to grant leave to file a sur-reply when 'the party making the motion would [otherwise] be unable to contest matters presented to the court for the first time in the opposing party's reply,'" *Lopez v. Council on Am.-Islamic Rels. Action Network, Inc.*, 657 F. Supp. 2d 104, 108 (D.D.C. 2009) (quoting *Lewis v. Rumsfeld*, 154 F. Supp. 2d 56, 61 (D.D.C. 2001)), *aff'd*, 383 F. App'x 1 (D.C. Cir. 2010) (per curiam).  "[A] surreply is not a vehicle for rehashing arguments that have already been raised and briefed by the parties." *Crummey v. Soc. Sec. Admin.*, 794 F. Supp. 2d 46, 63 (D.D.C. 2011), *aff'd*, No. 11-5231, 2012 WL 556317 (D.C. Cir. Feb. 6, 2012) (per curiam). For a surreply to be appropriate, the opposing party's reply must have raised "truly new" arguments. *THEC Int'l-Hamdard Cordova Grp.-Nazari Constr. Co., Ltd. Joint Venture v. Cohen Mohr, LLP*, 301 F. Supp. 3d 1, 6 (D.D.C. 2018) (quoting *U.S. ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 238 F. Supp. 2d 270, 277 (D.D.C. 2002)).  The court also considers "whether the movant would be unduly prejudiced were leave to be granted." *Doe v. Exxon Mobil Corp.*, 69 F. Supp. 3d 75, 85 (D.D.C. 2014) (quoting *Banner Health v. Sebelius*, 905 F. Supp. 2d 174, 187 (D.D.C. 2012)).  Ultimately, "[t]he decision to grant or deny leave to file a sur-reply is committed to the sound discretion of the court." *Flynn v. Veazey Constr. Corp.*, 310 F. Supp. 2d 186, 189 (D.D.C. 2004).

Mr. Jones fails to make any argument that leave to file a surreply is warranted. ECF No. 27; *see* ECF No. 28, at 1 & n.1. Rather, he just attaches what appears to be his proposed surreply, ECF No. 27-1, and a "new" exhibit, ECF No. 27-2. The court is disinclined to grant leave to a movant who, appearing through counsel, failed to argue that he satisfied the applicable legal standard. Nevertheless, the court concludes that Mr. Jones's surreply may aid the court in its resolution of Falconwood's argument—raised for the first time in the reply brief—that the court should disregard Mr. Jones's affidavit under the sham affidavit doctrine. *See* ECF No. 25, at 2-4. At the very least, consideration of the surreply would not prejudice Falconwood because the surreply "does not introduce any new facts that would change the outcome" of Falconwood's motion for summary judgment. *Tsai v. United States*, No. 23-CV-2392, 2025 WL 823891, at *4 (D.D.C. Mar. 14, 2025) (quoting *Amissah v. Gallaudet Univ.*, No. 19-CV-679, 2022 WL 4016592, at *7 (D.D.C. Sep. 2, 2022)). The court will accordingly exercise its discretion to grant Mr. Jones's motion for leave to file a surreply.

### 2.    Mr. Jones's affidavit

Falconwood also argues that the court should reject Mr. Jones's affidavit, ECF No. 22-6, under the "sham affidavit" doctrine, ECF No. 25, at 2-4. The sham affidavit doctrine "precludes a party from creating an issue of material fact by contradicting prior sworn testimony unless the 'shifting party can offer persuasive reasons for believing the supposed correction' is more accurate than the prior testimony." *Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1030 (D.C. Cir. 2007) (quoting *Pyramid Sec. Ltd. v. IB Resol., Inc.*, 924 F.2d 1114, 1123 (D.C. Cir. 1991)). "At the same time, however, courts must take care not to invade the province of the jury by disregarding affidavits or declarations based on non-dispositive inconsistencies or a witness's better recollection of facts after a deposition." *Yazzie v. Nat'l Org. for Women*, 712 F. Supp. 3d 56, 84 (D.D.C. 2024); *see*

16

*Richardson v. Petasis*, 160 F. Supp. 3d 88, 105 n.17 (D.D.C. 2015) (noting that, where the affiant later "recall[ed] something that he did not mention or recall during his deposition," there was no "contradiction requiring exclusion from consideration"); *U.S. Dep't of Just. v. Daniel Chapter One*, 650 F. App'x 20, 24 (D.C. Cir. 2016) (explaining that the district court "may have misapplied the [sham affidavit] rule" because the "supplemental declaration presented *new* information rather than contradictory information").

In support of its argument that the court should disregard Mr. Jones's affidavit, Falconwood points out inconsistencies between Mr. Jones's statements in the affidavit and his prior statements. For example, Mr. Jones states in his affidavit that Mr. Bean told him that Falconwood had billed the Navy $400,000 for his services. ECF No. 22-6 ¶¶ 26-27. That statement directly conflicts with Mr. Jones's deposition testimony because, when asked for the basis for his statement that Falconwood had billed the Navy $400,000 for his services, he merely stated that it was his "opinion" and "belief" based on his understanding that "other senior members have been billed out at $175 an hour" and that Falconwood's documented billing rate of $104 per hour for him "just doesn't make sense." ECF No. 20-4, at 11. And in Mr. Jones's interrogatory responses, when asked to list any individuals with knowledge of the allegations in his complaint, Mr. Jones did not list Mr. Bean. *See* ECF No. 25-2, at 2-10.

But in other disputed parts of the affidavit, Mr. Jones appears to merely state something he had not previously mentioned. For example, Mr. Jones avers for the first time in his affidavit that former Falconwood employee Francis Hetherington reviewed an audit Mr. Jones had prepared concerning project timelines and due dates and told Mr. Jones that it looked like Falconwood had committed fraud. ECF No. 22-6 ¶ 16. But in his interrogatory response, despite listing Mr. Hetherington as someone who would have personal knowledge of the facts underlying his

complaint, Mr. Jones nowhere suggested that Mr. Hetherington had ever said anything of the sort. ECF No. 25-2, at 7. Instead, Mr. Jones quoted a line from an email from Mr. Hetherington that Mr. Jones repeats elsewhere in his pleadings, in which Mr. Hetherington lamented that one of the "struggles" with the Project is "that there is no sense of a project lifecycle" and that "schedule development has no reliable info on which to base deliverables." ECF No. 1 ¶ 36; *see* ECF No. 25-2, at 7. To be sure, it strains credulity to think that Mr. Jones would have repeated Mr. Hetherington's direct quote about the Project being poorly executed several times throughout this case, *see* ECF No. 20-32, at 4 (Mr. Jones's administrative complaint); ECF No. 22, at 4, 15; ECF No. 22-11; ECF No. 25-2, at 7, without mentioning the fact that Mr. Hetherington had also told him that he believed Falconwood was committing fraud. But at summary judgment, the court is reticent to invade the province of the jury by making credibility determinations. *See Yazzie*, 712 F. Supp. 3d at 84-85. Accordingly, the court declines to set aside any portion of the affidavit.

### B.    The Merits

#### 1.    National Defense Authorization Act (Count I)

The NDAA makes it unlawful for a federal contractor to discharge or otherwise retaliate against an employee for

> disclosing . . . information that the employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant . . . or a violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract) or grant.

41 U.S.C. § 4712(a). An employee who believes that he has experienced retaliation under the NDAA "may submit a complaint to the Inspector General of the executive agency involved." *Id.* § 4712(b)(1). Such a complaint imposes a mandatory duty on the Inspector General: within 180

18

days—unless the parties agree to an extension—the Inspector General either "shall make a determination" that the complaint is frivolous, fails to state a claim, or has previously been addressed in another proceeding, or he "shall" investigate the complaint and submit a report of the findings to the complainant, contractor, and the head of the agency. *Id.* § 4712(b)(1)-(2). Once the agency head receives the report, he has thirty days to either issue an order denying relief, or, if he determines that there is "a sufficient basis to conclude that" retaliation occurred, to order "one or more" of the enumerated remedies. *Id.* § 4712(c). Finally, if the agency head issues an order denying relief *or* "has not issued an order within 210 days after the submission of a complaint . . . the complainant shall be deemed to have exhausted all administrative remedies with respect to the complaint, and the complainant may bring" suit in federal court. *Id.* § 4712(c)(2).

Falconwood argues that the court should grant summary judgment on Mr. Jones's NDAA claim for failure to exhaust. ECF No. 20, at 12-13. The court agrees. Mr. Jones filed his administrative complaint with the Naval Inspector General by letter dated July 18, 2023. ECF No. 20-32; *see* ECF No. 20, at 56 ¶ 63; ECF No. 22, at 12; ECF No. 22-24 ¶ 63. And he filed this suit on August 25, 2023, only thirty-eight days later. ECF No. 1. Because there was no final order denying relief, and because Mr. Jones commenced this action before the 210-day waiting period had elapsed, Mr. Jones has failed to comply with the NDAA's prerequisite for filing suit.

Mr. Jones does not dispute that he failed to exhaust his administrative remedies under the NDAA. Instead, he states that he was "unaware of any prohibition from filing the NDAA claim too early" and that Falconwood "suffered no prejudice" from his failure to exhaust because "extensive discovery was conducted" on his claim. ECF No. 22, at 12. But the "prohibition" on "filing too early" is neither ambiguous nor waivable. The NDAA, in a section titled "Exhaustion of Administrative Remedies," expressly states that only "[i]f" the agency head issues an order

19

denying relief "or has not issued an order within 210 days after the submission of a complaint . . . the complainant shall be deemed to have exhausted all administrative remedies . . . and may bring" a lawsuit in district court.  41 U.S.C. § 4712(c)(2).  That language makes clear that exhausting administrative remedies is a mandatory precursor to filing suit.

The NDAA's administrative scheme, which requires the agency to act on administrative complaints within a set time frame, reinforces the mandatory nature of the exhaustion requirement. *See supra* pp. 18-19; *see also Hidalgo v. Fed. Bureau of Investigation,* 344 F.3d 1256, 1259 (D.C. Cir. 2003) (recognizing an exhaustion requirement in FOIA, despite the absence of express language, where the scheme imposed mandatory response requirements on the agency). "[P]ermitting [Mr. Jones] to pursue judicial review without the benefit of prior [OIG] consideration would undercut 'the purposes of exhaustion, namely, "preventing premature interference with agency processes, . . . afford[ing] the parties and the courts the benefit of [the agency's] experience and expertise, . . . [or] compil[ing] a record which is adequate for judicial review.'" *Hidalgo*, 344 F.3d at 1259 (fourth through ninth alterations in original) (quoting *Ryan v. Bentsen*, 12 F.3d 245, 247 (D.C. Cir. 1993)).  And courts in this district have consistently recognized that the NDAA contains a mandatory administrative exhaustion requirement. *Angeline v. ATCS, PLLC*, No. 22-CV-1668, 2025 WL 3703770, at *4 (D.D.C. Dec. 22, 2025) (recognizing that a complainant may bring a claim under the NDAA "after exhausting administrative remedies"); *Arawole v. Master Sec. Co., LLC*, No. 23-CV-2413, 2025 WL 947477, at *8 (D.D.C. Mar. 28, 2025) (same); *Wykosky v. ATCS, PLLC*, No. 22-CV-1881, 2023 WL 4547992, at *4 (D.D.C. July 14, 2023) (same); *Scarlett v. Nat'l Sci. Found. Off. of Inspector Gen.*, No. 22-CV-188, 2022 WL 17830227, at *6 (D.D.C. Dec. 21, 2022) (same); *Sargent v. Pompeo*,

20

No. 19-CV-620, 2020 WL 5505361, at \*10 (D.D.C. Sep. 11, 2020) (same).  Mr. Jones raises no statutory argument to the contrary.

Mr. Jones next points out that, in the period between when he filed his complaint and when Falconwood filed its motion for summary judgment, OIG "administratively closed" his complaint. ECF No. 22, at 12.  To the extent this is an argument that Mr. Jones exhausted his claim, it fails because an administrative dismissal is not a "order denying relief." *See* 41 U.S.C. § 4712(c)(2). Rather, OIG's email indicates that the matter was being dismissed at least in part because Mr. Jones had failed to prosecute his complaint.  *See* ECF No. 22-21 (noting that OIG "requested any additional files or substantiating documents regarding [Mr. Jones's] allegation of fraud committed against the government" but "received none").  Indeed, rather than denying relief, OIG provided another opportunity for Mr. Jones to pursue his administrative remedy.  OIG stated that, in light of his failure to respond, "[a]t present, we see this matter . . . as warranting no additional action from this office," but "for this office to continue to review this matter," Mr. Jones would merely have to clarify his allegations and provide substantiating documents.  *Id.*  OIG requested that Mr. Jones provide a response by January 20, 2025, but Mr. Jones declined to do so.  *Id.*

Finally, Mr. Jones requests that the court dismiss his NDAA claim without prejudice and allow him to file an amended complaint curing his failure to exhaust.  ECF No. 22, at 13 n.7.  But the D.C. Circuit has held in a similar context that "the filing of an amended complaint after the [waiting] period expired cannot cure the failure to exhaust." *Murthy v. Vilsack*, 609 F.3d 460, 465 (D.C. Cir. 2010).  "[A]llowing [Mr. Jones] to cure his failure to exhaust administrative remedies by amending his complaint would contravene [the agency's] investigative duty and undermine Congress' policy of encouraging informal resolution." *Id.*  The court will accordingly grant Falconwood summary judgment on Count I.

21

### 2.    False Claims Act (Count II) and Section 1981 (Count III)

Mr. Jones raises overlapping retaliation claims under the FCA and Section 1981, arguing that Falconwood removed him from the Project in November 2020 and then terminated him in March 2021 because he had engaged in protected activity under both statutes.  *See* ECF No. 1 ¶¶ 70-74, 77-81.  The FCA "imposes civil liability on any person who presents false or fraudulent claims for payment to the Federal Government."  *U.S. ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 423 (2023).  Section 3730(h) of the statute protects "whistleblowers who seek to expose or to prevent government fraud."  *Singletary v. Howard Univ.*, 939 F.3d 287, 293 (D.C. Cir. 2019).  Section 1981, meanwhile, "prohibits racial discrimination in the 'making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.'"  *Carney v. Am. Univ.*, 151 F.3d 1090, 1092-93 (D.C. Cir. 1998) (quoting 42 U.S.C. § 1981(b)).  Section 1981's cause of action encompasses claims of retaliation against employees who complain of racial discrimination.  *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 446 (2008).

The "familiar *McDonnell Douglas* burden-shifting framework" applies to retaliation claims under both the FCA, *U.S. ex rel. Schweizer v. Océ N.V.*, 677 F.3d 1228, 1241 (D.C. Cir. 2012), and Section 1981, *see Carney*, 151 F.3d at 1092-93.  To make out a prima facie claim of retaliation, "a plaintiff must plead facts showing (i) that [he] engaged in protected activity, (ii) 'because of' which [he] was retaliated against."  *Singletary*, 939 F.3d at 293 (quoting *U.S. ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 (D.C. Cir. 1998)).  "To satisfy the second element, a plaintiff must further allege (a) that the employer knew [he] was engaged in protected activity, and (b) that the retaliation was motivated 'at least in part' by [his] protected activity."  *Id.* (quoting *Yesudian*, 153 F.3d at 736).

22

Once a plaintiff has established a prima facie case of retaliation, "the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action." *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1114 (D.C. Cir. 2016). "If the employer does this, the burden then shifts back to the plaintiff, who must be afforded a fair opportunity to show that the employer's stated reason for its actions was in fact pretext for unlawful discrimination." *Id.* Importantly, the D.C. Circuit has held that "where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). Instead, "the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally [retaliated] against the employee on the basis of [the protected characteristic]?" *Id.*

To show that an employer's stated reasons were pretextual, a plaintiff may cite "the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or [its] poor treatment of other employees in the same protected group . . . or other relevant evidence that a jury could reasonably conclude evinces an illicit motive." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015). In the context of retaliation, "[t]he temporal proximity between an employee's protected activity and [his] employer's adverse action is a common and often probative form of evidence," *id.*, although temporal proximity without more is insufficient to survive summary judgment, *see Minter v. District of Columbia*, 809 F.3d 66, 71-72 (D.C. Cir. 2015).

23

Falconwood argues it is entitled to summary judgment because Mr. Jones's claims fail at the prima facie stage—chiefly, it argues that Mr. Jones failed to establish that he engaged in activities protected by the FCA or Section 1981. ECF No. 20, at 23-25, 29-31. It also argues that even if Mr. Jones has made out a prima facie case under either statute, Falconwood had legitimate, non-retaliatory reasons for removing Mr. Jones from the Project in November 2020 and terminating him in March 2021. *Id.* at 25-28, 33-34. Following *Brady*'s mandate, the court begins and ends with the question whether Mr. Jones has offered evidence sufficient for a jury to disbelieve Falconwood's proffered legitimate reasons for its decisions.

### a.    *November 2020 reassignment*

Falconwood removed Mr. Jones from the Project's migration team on November 23, 2020, two days after Mr. Jones allegedly reported incidents of racial harassment to COO Jones and six days after Mr. Jones's most recent report stating that aspects of the project were "off track" and "at risk." ECF No. 22-6 ¶¶ 42-43; *see* ECF No. 20, at 48 ¶ 23; ECF No. 22-24 ¶ 23. Falconwood argues that, even if Mr. Jones were able to establish that any of his reports were protected activities under the FCA or Section 1981, the company had a legitimate, non-retaliatory reason for removing him from the project: its client, the Navy, had demanded his removal due to his deficient performance. ECF No. 20, at 25-28, 33-34; *see supra* p. 5; ECF No. 20-9 (Ms. Williams explaining that "[w]e have given him a number of assignments, [but] most of [the] results have not come to fruition or [realized] value" and asking for Falconwood to "reassign" Mr. Jones).

Falconwood's decision to remove Mr. Jones from the migration team because the Navy client was unhappy with his performance is both legitimate and non-retaliatory. As Mr. Jones admits, Ms. Licatovich "complie[d]" with Ms. Williams's decision "to take Jones off the team." ECF No. 22, at 14. And Falconwood's knowledge of its client's dissatisfaction with Mr. Jones's

performance is well-supported by the record. *See* ECF No. 20-8, at 7 (Mr. Bean's deposition testimony that Ms. Williams was unhappy with Mr. Jones's performance); ECF No. 20-10 (explaining in Mr. Jones's December 2020 performance review that "[t]he client has expressed dissatisfaction with his lack of productivity" and that he "fails to consider what is being asked by [the] client"); ECF No. 20-13 (Ms. Licatovich explaining in another December 2020 email that "the problem" was that "the client doesn't want to give him anything to do"); ECF No. 20-14 (Ms. Licatovich listing several messages directly from the client complaining about Mr. Jones's performance and attitude in a December 2020 email to Ms. Fields); *see* ECF No. 20-15 (email from Ms. Licatovich to Ms. Fields worrying that "the Government is having a meeting today and they are not happy that Edward is still around").

Rather than responding to the undisputed fact that Falconwood removed him from the Project at the Navy's request, Mr. Jones mostly argues that Falconwood has failed to establish that he had any "serious performance issues" before the Navy requested his removal. ECF No. 22, at 17. But this argument, and the parties' miscellaneous disputes about line items in Mr. Jones's December 2020 performance review, are immaterial. Whether or not Falconwood believed that Mr. Jones's performance was so deficient as to warrant his removal from the Project, the undisputed record shows that "Ms. Williams, the Navy employee in charge of the migration effort[,] was not happy with [Mr. Jones's] performance" and accordingly requested his removal. ECF No. 20, at 48 ¶ 22; ECF No. 22-24 ¶ 22. Accordingly, Falconwood is entitled to summary judgment with respect to Mr. Jones's November 2020 reassignment because—as the parties agree—its proffered reason for the move was its actual reason for the move: Falconwood's client requested Mr. Jones's removal based on its complaints about his deficient performance.

> b.    *March 2021 termination*

Mr. Jones also argues that Falconwood terminated his employment on March 15, 2021 because he engaged in activities protected by the FCA and Section 1981.  ECF No. 1 ¶¶ 71, 79. Falconwood has again proffered a legitimate explanation.  Specifically, after the Navy asked that Mr. Jones be removed from the Project's migration team, Ms. Licatovich tried to find Mr. Jones another "home" within the company instead of terminating him.  ECF No. 20-3, at 15.  But on his new team, Mr. Jones still required "inordinate amounts of coaching for the simplest of tasks," was "unable to perform quick turn actions," and "[w]hat he did deliver was full of errors and not usable."  ECF No. 22-18.  In addition, on March 10, Mr. Jones sent an "inappropriate"  email blaming his supervisor for his own tardiness on a chain that included Navy client stakeholders, ECF No. 20, at 55 ¶ 56; ECF No. 22-24 ¶ 56; *see* ECF No. 22-17, causing Ms. Licatovich to send an email to Human Resources and COO Jones in which she explained that Mr. Jones was unwilling to accept criticism, "reflected poorly on Falconwood," and, since he was unable to work on the project for which he had been hired, "need[ed] to go," ECF No. 20, at 55-56 ¶ 58; ECF No. 22-24, at 12 ¶ 58; *see* ECF No. 22-18.

Mr. Jones points out several perceived errors in Falconwood's assessments of his performance to argue that his termination was pretextual.  *See* ECF No. 22, at 22-24, 26-28.  None overcomes the significant evidence confirming that Falconwood fired him for legitimate performance-related reasons.  First, Mr. Jones suggests that Falconwood pretextually placed him on a PIP because, although the company cites a fifty-page set of meeting minutes as an example of his inability to understand work assignments, it did not produce the meeting minutes in discovery. ECF No. 22, at 23.  But Falconwood's failure to produce this evidence does not indicate that Falconwood lied about this minor detail.  To the contrary, Ms. Licatovich testified at her

deposition that Mr. Jones had presented her with a fifty-page set of meeting minutes when "[m]eeting minutes were generally two pages[, n]ot 50." ECF No. 20-3, at 19. Second, Mr. Jones suggests that because Mr. Bean testified that counseling "did help" his performance, he must have sufficiently improved during and after his PIP period such that termination could not have been warranted for non-retaliatory reasons. ECF No. 22, at 23. But Mr. Bean's statement that Mr. Jones showed some improvement after receiving counseling is entirely consistent with Ms. Licatovich's stated rationale that Mr. Jones still required "inordinate amounts of coaching for the simplest of tasks." ECF No. 22-18; *see* ECF No. 20, at 55-56 ¶ 58; ECF No. 22-24 ¶ 58. Similarly, Mr. Jones suggests that Ms. Licatovich's deposition testimony—in which Ms. Licatovich acknowledged that Mr. Jones did send a risk registry report on March 10, although not "in time" for Mr. Scott to use it for the meeting, *see* ECF No. 22-4, at 18-19—conflicts with her stated reason for terminating him for failing to complete the risk registry report on March 10, ECF No. 22, at 27. But the record reflects that Mr. Jones did not send the report in time for the meeting, necessitating Mr. Scott to send it to the stakeholders late and with an apology. *See supra* pp. 10-11.

But even if a jury could credit any of Mr. Jones's points, such quibbles cannot defeat summary judgment. In cases like this where alleged pretext arises from the parties' disagreement about a subordinate employee's performance, courts must be "vigilant in smoking out unlawful motives while remaining 'reluctan[t] to become involved in the micromanagement of everyday employment decisions.'" *Allen*, 795 F.3d at 41 (alteration in original) (quoting *Forman v. Small*, 271 F.3d 285, 291 (D.C. Cir. 2001)). "'If the employer's stated belief about the underlying facts is reasonable in light of the evidence,' and is honestly held, there ordinarily is no basis to put the case to a jury, even if the employee disagrees with the discretionary decision the employer made."

*Id.* (quoting *Brady*, 520 F.3d at 495).  Here, Ms. Licatovich's stated beliefs about Falconwood's issues with Mr. Jones's performance are both entirely consistent and eminently reasonable.  The undisputed record confirms that Ms. Licatovich determined that Mr. Jones had routinely missed deadlines on projects such as the white paper, *see supra* p. 8-9, and March 10 risk registry report, *see supra* pp. 10-11; that he had been removed from the project he had been hired to do at the client's request, ECF No. 20-9; *see* ECF No. 22-24 ¶ 23; and that he was reflecting poorly on the company by criticizing his supervisor in an email to client stakeholders, ECF No. 20, at 55-56 ¶ 58; ECF No. 22-24 ¶ 58; *see* ECF No. 22-17.

Finally, Mr. Jones argues that a jury could infer pretext under Section 1981 because Falconwood departed from its policy of investigating racial harassment claims by failing to investigate his January 6, 2021 email.  ECF No. 22, at 26-27.  Falconwood responds that the January 6 email does not constitute a complaint of racial harassment.  ECF No. 20, at 31.  The court agrees with Falconwood.  In the email, Mr. Jones laid out several issues with his supervisors and stated that, "[d]ue to these constantly harassing tactics by Falconwood, I am now part of a hostile work environment" and "am constantly being harassed."  ECF No. 1-1, at 4.  He further stated his "hope that . . . providing notification of this hostile work environment" would "result in Falconwood offering classes in 'Harassments', 'Race Relations', 'Bullying', etc."  *Id.*  But nowhere in his email does Mr. Jones allege that he was being harassed *because* of a protected status—indeed, nowhere does he mention a protected status at all.  *See generally* ECF No. 1-1.  To be sure, Mr. Jones mentions classes on harassment and race relations, but his generic statements hoping that Falconwood would add programming in the future are insufficient to connect his complaints of general harassment to racial discrimination actionable under Section 1981.  *See Balaj v. Turner*, 778 F. Supp. 3d 151, 165, 181 (D.D.C. 2025) (concluding that an employee did

not engage in protected activity by sending an email to her boss that stated "You discriminate me all time" and "You are being hostile towards me"); *see also Coleman v. Potomac Elec. Power Co.*, 422 F. Supp. 2d 209, 213-14 (D.D.C. 2006) (agreeing with the defendants that the plaintiff failed to show "that he was engaged in statutorily protected activity" by complaining about his evaluation, his supervisors, and harassment because he "fail[ed] to allege that this treatment was because of any illegal factor" (internal quotation marks omitted)); *Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 92-93 (D.D.C. 2006) (collecting cases and concluding that the plaintiff's harassment claims were insufficient to constitute protected activity under Section 1981 because her complaint "allege[d] harassment generally and generically" and did "not refer to harassment [or discrimination] based on race or any other protected category" (second alteration in original) (internal quotation marks omitted)).  Falconwood reasonably did not construe Mr. Jones's email as complaining of racial harassment, so its decision not to conduct an investigation is not evidence of pretext.  *See* ECF No. 22-15 (Ms. Licatovich responding to the email, with no mention of race, that while she was "sorry" that Mr. Jones felt he was in a "hostile work environment," "[r]eviews and questions are common and frequently used companywide").

## V.    CONCLUSION

For the foregoing reasons, the court will grant Mr. Jones's motion for leave to file a surreply, ECF No. 27, and grant Falconwood's motion for summary judgment, ECF No. 20.  A contemporaneous order will issue.

LOREN L. ALIKHAN
United States District Judge

Date: March 31, 2026